T.C. Memo. 2020-148

UNITED STATES TAX COURT

GLADE CREEK PARTNERS, LLC, SEQUATCHIE HOLDINGS, LLC, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22272-17.                    Filed November 2, 2020.

Gregory P. Rhodes, David M. Wooldridge, Ronald A. Levitt, and Michelle A. Levin, for petitioner.

W. Benjamin McClendon, Amber B. Martin, and William W. Kiessling, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: In 2012 Glade Creek Partners, LLC (Glade Creek), donated a conservation easement on 1,313 acres of undeveloped real estate on the Cumberland Plateau in Bledsoe County, Tennessee, and claimed a $17.5 million

[*2] charitable contribution deduction (easement deduction) for its short tax period November 30 to December 31, 2012 (December 31, 2012, short tax period).[1] The land was part of a failed residential development. Glade Creek acquired the land in a transaction intended to rescue the developers from debt associated with the failed development. The primary issue is whether Glade Creek is entitled to the easement deduction under the technical requirements of section 170. We hold it is not. We hold that the deed of easement does not protect the conservation purposes in perpetuity as required by section 170(h)(5). We hold further that Glade Creek is entitled to deduct a $35,077 cash charitable contribution that respondent denied.[2]

Respondent asserts a 40% penalty under section 6662(e) and (h) for a gross valuation misstatement on the basis of the reported value of the easement and, alternatively, with respect to Glade Creek's misstatement of the value of the charitable contribution, a 20% penalty under section 6662(a) and (b)(1), (2), and

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts and the acreage of land parcels are rounded.

[2]Petitioner contends that it has produced credible evidence regarding the deductibility and the value of the easement contribution and the burden of proof has shifted to respondent under sec. 7491(a)(1). We decide the issues here on the basis of the record and the preponderance of the evidence and find the sec. 7491 issue moot.

[*3] (3) for negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. We sustain the 20% accuracy-related penalty for a substantial valuation misstatement in excess of the easement's fair market value, which we determine to be $8,876,771. We do not impose a 20% penalty on the remainder of the adjustment.

FINDINGS OF FACT

Glade Creek is a Georgia limited liability company (LLC) and has elected partnership status for Federal tax purposes. When the petition was timely filed, its principal place of business was in Georgia.

I.      History of the Property

In January 2006 International Land Co. (ILC) purchased 1,997.25 acres of land in Bledsoe County (Bledsoe property) for over $9 million in a seller-financed arrangement. ILC planned to subdivide and market lots on 1,993 acres of the Bledsoe property in separate phases to out-of-State purchasers for the construction of vacation homes.[3] The first phase of ILC's plan was tract I, a 677-acre parcel with 415 lots, and subsequent phases were tracts II and III, noncontiguous parcels connected by tract I, of 630.4 and 685.5 acres, respectively, with 391 more lots.

---

[3]Approximately 4 acres of the 1,997-acre Bledsoe property were not part of ILC's development.

[*4] The easement property is 1,312 acres of tracts II and III; 4 acres are not subject to the easement.

When ILC purchased the Bledsoe property, it was undeveloped, with rolling mountains and level, buildable areas, forests, streams, ponds, waterfalls, and four miles of bluffs overlooking the Sequatchie Valley. The property required significant infrastructure to support a residential development, including improved hydraulic capacity for water service, electrical infrastructure, and roads. The property was serviced with one low-current electrical power line typical in rural areas and no interior roads. Also, the local water authority did not have a sufficient water supply to support a residential community. The surrounding area was primarily used for agriculture or recreation. Nearby commercial development was limited; it included restaurants, grocery stores, a pharmacy, a small hospital, service stations, and limited retailers. There was also a State prison nearby.

ILC was owned by a small group of out-of-State developers. Before purchasing the land, ILC sought the advice of a local businessman, James Vincent, on its development potential. Mr. Vincent was a local real estate investor and had contacts with local government officials to facilitate the project from his time as a commissioner of a nearby county where he served on the planning commission and as a State representative. After ILC purchased the land Mr. Vincent became

[*5] highly involved in the development project. He assisted with procuring permits from State and local governments, utility contracts, and bank financing. He invested a considerable amount of his own money in the infrastructure and personally guaranteed ILC's bank loans. At first Mr. Vincent did not have a financial interest in the development, but ILC later agreed to compensate him for his services and reimburse his expenses with a percentage of its profits.

ILC obtained permits and approvals with respect to all three tracts. However, development was limited to 50 acres at any time of residential construction by individual lot buyers to minimize the disruption to the land. The approval process involved testing the soil for its suitability for construction, including water absorption. ILC obtained a 25-year contract from a nearby water authority for a water supply sufficient to support development of all three tracts. It spent $1.2 million to construct a pump station to provide hydraulic pressure to transport the water to the Bledsoe property and $2 million to install water main pipes from the pump station throughout tract I. It paved roads throughout tract I. It installed electrical infrastructure that could service a residential development on all three tracts. Electricity would be connected to individual lots when home construction began. The improved water lines, roads, and electrical lines extended to the borders of tracts II and III for the later planned development of those tracts.

[*6] Overall, ILC spent approximately $6 million on the infrastructure and approval process.

In March 2007 ILC recorded the planned lots on tract I and easements along creeks and waterfalls and placed restrictions on the cutting and clearing of timber. It did not record the lots on tracts II and III. It planned to market tracts II and III after tract I lots sold out. Mr. Vincent believed that recording the lots would increase property tax. ILC began sales of tract I lots in March 2007, selling 75 lots in 2007 and 46 lots in 2008. Lots with bluff views sold for as much as $150,000. Sometime in 2009 ILC stopped marketing the lots because it ran out of money, causing sales to slow dramatically; it sold only nine lots in 2009. Facing slow sales, a depressed real estate market, and substantial debt, the investors faced enormous pressure and uncertainty. One investor walked away. The remaining investors and Mr. Vincent devised a plan to transfer the unsold lots in tract I and all of tracts II and III to Mr. Vincent and two members of ILC. Mr. Vincent was not a member of ILC but had invested substantial amounts of time and money in the project and had personally guaranteed ILC's bank loans.

In April 2010 the three men organized Hawks Bluff Investment Group, Inc. (Hawks Bluff), an S corporation, as equal owners, and acquired the remaining unsold land by warranty deed in exchange for the assumption of ILC's liabilities.

[*7] Initially, the three men made equal monthly payments on the debt (Hawks Bluff debt), which totaled $33,000 per month. A short time later one stopped making payments and surrendered his interest in exchange for the two remaining members, Mr. Vincent and Mr. Tague, assuming his share of the debt and releasing him from liability. The prospects of the development continued to worsen. Messrs. Vincent and Tague struggled to make debt payments. Without any marketing Hawks Bluff sold only two lots during 2010 and 2011 and no lots in 2012. In April 2011 Hawks Bluff entered into a mortgage modification agreement that paid off $2.1 million of the remaining $5.2 million unpaid purchase price to the original seller of the Bledsoe property through a land transfer to the mortgagee and the issuance of two promissory notes and the mortgagee's agreement to reduce the outstanding debt by an additional $1.3 million "in consideration of the downturn in the economy and the difficulty encountered * * * in marketing the Hawks Bluff Subdivision". After this modification, Hawks Bluff owed $1.8 million to the original seller and had approximately $3.3 million in total debt. Mr. Vincent worried about the possibility that Mr. Tague would stop paying his share of the Hawks Bluff debt especially since Mr. Vincent had personally guaranteed a considerable portion of the loans for the infrastructure. Mr. Vincent

**[*8]** was not certain that he could fund the monthly debt payments for an extended time if Mr. Tague stopped making payments.

In his efforts to find a financing solution, Mr. Vincent learned about conservation easements from the president of the bank that held the infrastructure loans. At the bank president's suggestion, Mr. Vincent sought advice from Matthew Campbell about donating a conservation easement on the Bledsoe property to raise money to repay the debt. Mr. Vincent also considered harvesting timber from the land and selling the land to a developer, most likely through fire sales of 5- to 15-acre parcels. He believed that these two options would have raised enough money to repay the Hawks Bluff debt. However, for Mr. Vincent, neither option would satisfy his desire to protect the Cumberland Plateau and the natural beauty of the Bledsoe property. He did not want to sell to a developer who would use it for a mobile home community, recreational vehicle park, or other environmentally insensitive development. He believed that these types of developments would negatively affect the development on tract I, which Hawks Bluff would continue to own and market the unsold lots. He also felt a duty to the individuals who had purchased tract I lots to maintain the original vision of ILC's plan. He had no desire to develop the land himself.

[*9] II.       Easement Transaction

Mr. Vincent decided to pursue a conservation easement on tracts II and III. Mr. Campbell understood that the goal was to raise enough money to repay the Hawks Bluff debt and designed the easement transaction with that goal in mind. He designed the easement transaction to occur through two newly organized entities, one to hold the easement property, Glade Creek, and the second, Sequatchie Holdings, LLC (Sequatchie), to promote the easement transaction to investors. Sequatchie would use the proceeds from its private offering to purchase a majority membership interest in Glade Creek and then vote to grant the conservation easement. Mr. Campbell set the offering price for Sequatchie to raise enough money to repay the Hawks Bluff debt and did not consider the property's fair market value. The debt was repaid before the easement's grant.

Mr. Vincent believed that the land was worth substantially more than what Sequatchie paid for its Glade Creek interest. However, the transaction accomplished his primary goal, to repay the Hawks Bluff debt while preserving the land and protecting the original vision of the development. In Mr. Vincent's opinion the easement transaction was the only option that satisfied all his objectives. He was proud of the conservation easement but did not understand the

[*10] specifics of the easement transaction.  Hawks Bluff retained the unsold lots in tract I and continued to sell them.  In 2015 it sold 24 lots.

Glade Creek was organized on August 3, 2012.  Hawks Bluff owned 98%, and Messrs. Tague and Vincent each owned 1%.  Hawks Bluff contributed the easement property subject to a $1,776,000 mortgage.  Glade Creek had a carryover basis in the land of $3,861,316.  Messrs. Vincent and Tague each contributed $1,000 and a promissory note for $36,500.  Sequatchie was organized on August 12, 2012.  Evrgreen Capital Administration, LLC (Evrgreen), was Sequatchie's managing member and tax matters partner.  Mr. Campbell is Evrgreen's founder and became Glade Creek's manager as part of the easement transaction.  After the transaction, Sequatchie was Glade Creek's tax matters partner.  Evrgreen manages about 30 entities similar to Sequatchie that sold membership interests to investors by promoting charitable contribution deductions for conservation easements.

As Sequatchie's and Glade Creek's manager, Mr. Campbell engaged the professionals necessary to complete the easement transaction, including a brokerage firm, Dempsey Lord Smith, LLC (Dempsey Lord Smith), a securities lawyer, Michael Horten, for assistance with the private offering, and Tim Pollock of Morris, Manning, & Martin, LLP, for tax advice on the easement deduction.  Mr. Pollock reviewed the deed to ensure that it complied with section 170(h).  He

**[*11]** had the relevant information necessary to offer his professional opinion and advised that the easement donation would qualify for a charitable contribution deduction. Mr. Campbell also engaged two appraisers, Claud Clark III and James Clower, to value tracts II and III for the private offering. Mr. Campbell prepared a restricted report dated October 26, 2012, of the value of the easement without visiting the easement property. He used a before and after valuation method which valued the easement property unencumbered by the easement and used for a hypothetical development similar to ILC's project (before value) and valued the property restricted by the easement (after value).

On November 29, 2012, Sequatchie entered into an agreement with the members of Glade Creek to purchase one Glade Creek interest for each Sequatchie interest issued in its private offering up to 3,363,000 interests. Glade Creek members would sell their interests on the basis of their relative ownerships. That same day, Sequatchie issued a private placement memorandum (PPM) offering membership interests for $1 each.[4] The PPM set a minimum and a maximum number of interests for sale at 3,186,000 and 3,363,000, respectively, which would

---

[4]Dempsey Lord Smith, Mr. Pollock, and Mr. Horten drafted the PPM.

**[\*12]** result in Sequatchie's ownership of 90% to 95% of Glade Creek.[5] The PPM states that the purpose of the offering was to raise funds to purchase Glade Creek and that Glade Creek owns 1,316 acres of undeveloped land. It identifies three options for the land: holding it for future appreciation or future development or granting a conservation easement on all or part of the land. It contains 10 pages discussing Federal tax considerations and 5 pages discussing tax risks from an easement deduction including audit risks and the speculative nature of valuations. It does not analyze the potential benefits or risks from developing or holding the property. It estimates that the conservation easement would generate a charitable contribution deduction of $17.7 million on the basis of Mr. Clark's appraisal. Before the PPM, Dempsey Lord Smith issued an offering overview promoting the $17.7 million deduction which lists the tax benefits for different investment amounts; for example, a $250,000 investment would generate a $1.25 million charitable contribution deduction.

Sequatchie sold 3,224,400 interests. On December 27, 2012, it purchased 3,224,000 interests in Glade Creek and paid out the subscription proceeds as follows: $1,776,000 for repay of the Hawks Bluff debt, $504,954 for payment to

---

[5]Members could put their interests back to Sequatchie for three cents per unit beginning on January 1, 2017.

[*13] Glade Creek's members for their interests, $300,000 for Evrgreen's management fees, $77,400 for legal and escrow fees, $290,196 for broker fees, $24,750 for miscellaneous expenses, and $225,000 for Glade Creek's capital reserves.  Sequatchie retained $26,000 for working capital reserves.

III.    Grant of Easement

On December 29, 2012, two days later, Glade Creek granted a conservation easement to the Atlantic Coast Conservancy, Inc. (Conservancy), on 1,313 acres of tracts II and III.[6]  The deed of easement states that the easement is intended to preserve open space for wildlife habitats threatened by development and provide significant public benefit, scenic views of the Cumberland Plateau, and agricultural land.  It states that the easement property "will be retained forever predominantly in its natural condition" and the easement will "prevent any use * * * that will materially impair or interfere with the Conservation Values".  The deed grants enforcement rights to the Conservancy so that it can protect the easement property and prevent uses inconsistent with the conservation values.

The deed contains nonexclusive lists of prohibited and permitted uses. Glade Creek reserved the right to engage in all uses not expressly prohibited by the deed that are consistent with the easement's conservation purposes.  Prohibited

---

[6]Three acres, 1.5-acres on each tract, are not subject to the easement.

[*14] uses include the change, disturbance, or impairment of the natural habitat, construction of buildings, structures, and roads, removal, cutting, or destruction of natural vegetation, and exploration or extraction of minerals, oil, gas, or other materials. Permitted uses include agriculture and the construction of a single-family dwelling, accessory buildings, access roads, fences, a subsistence garden, hunting stands and platforms, and trails. Construction of the dwelling and accessory buildings is expressly conditioned on 30 days' written notice to the Conservancy and before commencing construction. The Conservancy has 30 days to grant or withhold its approval on the basis of its informed judgment about the construction's impact on the easement property, and if it does not timely respond, approval is deemed given (default provision).[7] The deed expressly states that Glade Creek may engage in the other enumerated permitted uses without prior written notice or approval.

The deed addresses the involuntary extinguishment of the conservation easement and allocates any proceeds from an extinguishment as follows:

> [T]his Easement shall have at the time of Extinguishment a fair
> market value determined by multiplying the then fair market value of

---

[7]The deed provides for a liberal construction of its terms, which is relevant when interpreting an ambiguous provision: "Any general rule of construction to the contrary notwithstanding, this Easement shall be reasonably construed in favor of the grant to affect [sic] the Purpose of this Easement".

[*15] the Easement Area unencumbered by the Easement (minus any increase in value after the date of this grant attributable to improvements) by the ratio of the value of the Easement at the time of this grant to the value of the Easement Area, without deduction for the value of the Easement, at the time of this grant. The Conservation Values at the time of this grant shall be those Conservation Values used to calculate the deduction for federal income tax purposes allowable by reason of this grant, * * * [and] the ratio * * * shall remain constant.

Thus, the deed subtracts from the extinguishment proceeds any increase in the fair market value of the easement property attributable to posteasement improvements before determining the Conservancy's share.

At the time of the easement's grant the easement property had an assessed value of approximately $2.2 million. County records show that the property was sold for $2.2 million and $4.8 million in August 2004 and January 2005, respectively.

IV.    Partnership Return

Glade Creek filed Form 1065, U.S. Return of Partnership Income, for its December 31, 2012, short tax period (2012 return). Glade Creek reported a basis in the easement property of $3,861,316 and claimed an easement deduction of $17,504,000 and a cash contribution deduction of $40,077. Mr. Clark prepared a second fair market appraisal of the easement property dated February 10, 2013, that Glade Creek attached to the 2012 return (February 2013 appraisal). He

**[\*16]** determined the same before value, $18,486,892, as in his October 2012 report, but his after value, $787,752, differs by $552 because he corrected an omission of .92 acres from the October 2012 report. The per-acre after values are the same in both valuation reports, $600 per acre. On the basis of these figures Mr. Clark appraised the easement at $17,504,000.

Respondent issued to petitioner a notice of final partnership administrative adjustment (FPAA) asserting that Glade Creek was not entitled to deduct the $17,504,000 easement donation or $35,077 of its cash donation and asserting a 40% section 6662(e) and (h) penalty with respect to the easement deduction and, alternatively, a 20% penalty under section 6662(a) and (b)(1), (2), and (3) for negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement.

V.    Expert Testimony

   A.    Petitioner's Experts

Petitioner presented Mr. Norton as a land-use expert and Mr. Clark as a valuation expert. Mr. Norton prepared a market study of economic trends, housing demand, the target market, and regional attractions and amenities. He opined that the highest and best use of the land before the easement's grant was residential development and after the easement's grant, recreational use. He envisioned a

**[*17]** resort-style community offering outdoor activities marketable to multigenerational families as vacation homes. He opined that the easement property had excellent development potential because of its bluff views, streams, and flat buildable areas. He testified that the property was not too steep for development and that the property's easy access from three interstate highways, the existing development approvals and infrastructure from ILC's project, and its proximity to three major Tennessee cities (Chattanooga, Knoxville, and Nashville), commercial development, and a popular State park increased its development potential.

As part of his testimony, Mr. Norton provided a concept plan for a hypothetical development similar to ILC's project with slight alterations for the construction of two lakes, a community pool, and a pavilion area. He identified five types of lots on the easement property: interior, nature view, bluff view, premium bluff view, and lake front, and estimated a price range and average price

[*18] for each lot type on the basis of the lot prices in seven nearby benchmark residential communities (benchmarks):[8]

| Lot type | No. of lots | Low | High | Average |
|---|---|---|---|---|
| Interior | 187 | $30,000 | $70,000 | $50,000 |
| Nature view | 88 | 45,000 | 80,000 | 62,500 |
| Bluff view | 41 | 70,000 | 130,000 | 100,000 |
| Lake view | 42 | 70,000 | 130,000 | 100,000 |
| Premium bluff view | 53 | 90,000 | 160,000 | 125,000 |

He calculated the combined price range and average prices for each lot type for the seven benchmarks:

| Lot type | Low | High | Average |
|---|---|---|---|
| Standard | $44,059 | $100,945 | $65,308 |
| Premium | 107,279 | 161,636 | 133,473 |

He did not adjust the lot prices for differing sizes of the lots.

Mr. Norton testified that a development on the easement property would require aggressive marketing of the lots and upfront investments in community amenities to attract buyers. He also recommended the construction of model homes and for-sale homes to differentiate the hypothetical development from its

---

[8]The benchmarks were Jasper Highlands, Cooley's Rift, Brow Wood, Fairfield Glade, Hawks Bluff Van Buren, Long Branch Lakes, and ILC's tract I.

[*19] competitors.  He testified that lots would sell out within seven years and the number of annual sales (absorption rate) over the seven-year absorption period would follow a bell curve with sales increasing annually as the development is built then decreasing in later years.

In his expert report Mr. Clark determined that the conservation easement had a fair market value of $16,245,000, slightly less than the $17,504,000 value that he determined in his February 2013 appraisal and that Glade Creek reported on its 2012 return.  Mr. Clark reviewed Mr. Norton's market analysis and the sale data of the benchmarks.  For his before valuation he performed a discounted cashflow analysis from the sale of lots in Mr. Norton's hypothetical development and determined a before value of $17,314,049.  Mr. Clark agreed with Mr. Norton's vision of amenities, marketing, and model and for-sale homes.  He priced the lots using Mr. Norton's average price for each lot type.  His absorption rate was also on a bell curve over seven years but had different annual sale numbers with higher initial sales.  Mr. Clark estimated gross revenues of $32,689,186, adjusted for 3% to 4% annual appreciation of the unsold lots over the seven-year absorption period.

Mr. Clark estimated the development costs by taking into account the cost savings because of the existing approvals and infrastructure from ILC's project.

[*20] He estimated construction costs of $3.4 million to build two lakes, roads, underground electricity, telephone, and waterlines, a pool, and other amenities and $3.4 million in operating costs over the absorption period for sales commissions, marketing, closing costs, property tax, and overhead. He also treated the hypothetical developer's profit as a line-item expense and calculated the developer's profit to be 15% of his estimated construction and operating expenses. On the basis of his sales projections and estimated expenses, he calculated the hypothetical development's annual net revenues and applied a 11.25% discount rate, resulting in a before value of $17,314,049.

Mr. Clark determined the easement property's after value was $919,000 with an enhancement value of $150,000 for the acres not subject to the easement. He opined that the easement had a fair market value of approximately $16,245,000.

B.    Respondent's Expert

Respondent offered Ben Broome as an expert witness. Mr. Broome opined that the highest and best use of the easement property before the easement's grant was rural residential, agricultural, and recreational. He opined that the easement property had limited utility for residential development because of its steep topography. He determined a before value of $1,200 per acre, $1,580,000.

**[\*21]** Mr. Broome used a comparable sales method to determine the before and after values but testified that there were few sales of large acreage parcels near the easement date. He identified seven properties as comparable to the easement property (comparables) that yielded sale prices of $630 to $2,200 per acre. He made qualitative adjustments to the sale prices to account for differences in the topography, access, infrastructure, and location between each comparable and the easement property. Five of the seven comparables were sold over four years before the easement date. The closest sale was two years and nine months before the easement date. However, Mr. Broome opined that no adjustment was necessary for the time lapse. Three comparables were sold for their timber.

In his brief respondent mentions only three comparables as relevant:

| Property | Sale date | Acres | Price | Per-acre price |
|---|---|---|---|---|
| Brock Rd. | Feb. 24, 2010 | 875 | $1,312,770 | $1,500 |
| Highway 70E | May 6, 2009 | 5,833 | 4,104,000 | 704 |
| Porch Rock Rd. | Jan. 2, 2010 | 670 | 422,500 | 630 |

The Brock Rd. property had been logged before its sale, was accessible only by an easement, and did not have any existing permits or approvals or a ready supply of water to support development. The Highway 70E property was sold in bankruptcy and was over four times the size of the easement property. The Porch

**[*22]** Rock Rd. property was purchased by a logging company for its timber. Mr. Broome's highest priced comparable, Old CC Rd., is a 1,117-acre parcel consisting of mountainous woodland and pastureland that sold for $2,200 per acre in May 2008. Mr. Broome testified that Old CC Rd.'s pastureland makes it better suited for residential development than the easement property.

To determine the after value Mr. Broome used a diminution in value method that applies a percentage decrease to the before value. He applied a 40% decrease in the value of the easement property after the easement's grant. He relied on an article published in 1998 that evaluated sales of agricultural easements in California to determined the 40% decrease. At trial we struck the portion of his report containing the after value analysis as not helpful.

## OPINION

Section 170(a)(1) allows taxpayers to deduct charitable contributions made within the taxable year. If the taxpayer makes a charitable contribution of property other than money, the deduction is generally equal to the donated property's fair market value at the time of the donation. Sec. 1.170A-1(c)(1), Income Tax Regs. Generally, a taxpayer is not entitled to deduct the donation of "an interest in property which consists of less than the taxpayer's entire interest". Sec. 170(f)(3)(A). An exception is made for a contribution of a partial interest in

[*23] property that constitutes a "qualified conservation contribution." Id. subpara. (B)(iii). The exception applies where: (1) the taxpayer donates a "qualified real property interest," (2) the donee is "a qualified organization," and (3) the contribution is "exclusively for conservation purposes." Id. subsec. (h)(1). The donation must satisfy all three requirements. Irby v. Commissioner, 139 T.C. 371, 379 (2012). Respondent challenges Glade Creek's easement deduction on multiple grounds. We find that Glade Creek is not entitled to the easement deduction because the contribution is not "exclusively for conservation purposes". We do not address respondent's alternative arguments.[9]

I.     Perpetuity Requirement

A contribution is "exclusively for conservation purposes" if its conservation purpose is "protected in perpetuity." Sec. 170(h)(5)(A) (perpetuity requirement).

---

[9]Respondent makes two alternative arguments: (1) the deed fails the sec. 170(h)(5) perpetuity requirement on the basis of the default provision and (2) the deed does not place a use restriction on the property in perpetuity as required by sec. 170(h)(2) because a merger provision in the deed could terminate the easement. In Hoffman Props. II, L.P. v. Commissioner, T.C. Dkt. No. 14130-15 (Mar. 14, 2018), aff'd, 956 F.3d 832 (6th Cir. 2020), we held that the donee did not have sufficient legal rights to prevent inconsistent uses on the basis of a default provision. This case differs in two ways: (1) the consent and default provisions apply only to a single-family dwelling and not "all uses" as in Hoffman Props. and (2) the deed in Hoffman Props. expressly stated that deemed consent meant the use was not a violation of the deed; there is no such provision in the deed here.

[*24] The regulations interpreting section 170(h)(5) recognize that "a subsequent unexpected change in the conditions surrounding the property * * * can make impossible or impractical the continued use of the property for conservation purposes".  Sec. 1.170A-14(g)(6)(i), Income Tax Regs.  In such an event the easement would not be protected in perpetuity.  However, the regulation provides a way for the perpetuity requirement to be deemed satisfied:  "[T]he conservation purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceeding" and the donee uses its share of the "proceeds * * * from a subsequent sale or exchange of the property * * * in a manner consistent with the conservation purposes of the original contribution."  Id.

Section 1.170A-14(g)(6)(ii), Income Tax Regs. (proceeds regulation), requires that the donee's share of the extinguishment proceeds be determined as follows:[10]

> [A]t the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time. * * * [T]hat proportionate value of the donee's property rights shall remain constant.  Accordingly,

---

[10]We upheld the procedural and substantive validity of the proceeds regulation in Oakbrook Land Holdings, LLC v. Commissioner, 154 T.C. __, __ (slip op. at 25, 28-31) (May 12, 2020).

[*25] when a change in conditions gives rise to the extinguishment of a
perpetual conservation restriction * * * the donee organization, on a
subsequent sale, exchange, or involuntary conversion of the subject
property, must be entitled to a portion of the proceeds at least equal to
that proportionate value of the perpetual conservation restriction,
unless state law provides that the donor is entitled to the full proceeds
* * *

The plain text of the proceeds regulation requires the donee to receive a

proportionate share of the extinguishment proceeds and does not permit the value

of any posteasement improvements to be subtracted out before determining the

donee's share.  Coal Prop. Holdings, LLC v. Commissioner, 153 T.C. 126, 139

(2019) (holding that an easement deed with a nearly identical proceeds

computation failed the perpetuity requirement); Oakbrook Land Holdings, LLC v.

Commissioner, T.C. Memo. 2020-54, at *40-*41; see PBBM-Rose Hill, Ltd. v.

Commissioner, 900 F.3d 193, 208 (5th Cir. 2018).

The deed improperly subtracts any value attributable to posteasement

improvements from the extinguishment proceeds before determining the

Conservancy's share.  It does not properly allocate extinguishment proceeds to the

Conservancy in accordance with the proceeds regulation.  The proceeds regulation

is not satisfied, and the easement's conservation purposes are not protected in

perpetuity.  Glade Creek is not entitled to the easement deduction.

**[*26]** II.    Cash Donation Deduction

Respondent argues that Glade Creek is not entitled to deduct a cash

contribution of $35,077 to the Conservancy because the escrow agent did not pay

the money to the Conservancy until January 2013.  Petitioner argues that we

should treat the donation as made when Glade Creek paid the money at closing.

Ordinarily, a charitable contribution is made when its delivery is effected.  Sec.

1.170A-1(b), Income Tax Regs.  When delivery is effected through an agent acting

on behalf of the donee or donor, the critical question is whether the donor has

relinquished dominion and control.  Fakiris v. Commissioner, T.C. Memo. 2017-

126, at *13-*14.  Respondent argues that when an escrow is used for delivery,

conditions to delivery exist that must be satisfied before the delivery is effective.

See Short v. Commissioner, T.C. Memo. 1997-255, 1997 WL 305863, at *3-*4

(holding that the donor must make an irrevocable transfer of control over the

donated property); Parrott v. Parrott, 48 Tenn. (1 Heisk.) 681 (1870).

If the transfer of the charitable contribution depends on the performance of

some act or the happening of a precedent event to become effective, the taxpayer

is not entitled to a charitable contribution deduction unless the possibility that the

condition will not occur is so remote as to be negligible.  Sec. 1.170A-1(e),

Income Tax Regs.  Thus, a condition that is so remote as to be negligible is

[*27] immaterial and does not preclude a finding that a transfer of control to the donor occurred for purposes of the deductibility of the charitable contribution. Id. A condition is so remote as to be negligible where "every dictate of reason would justify an intelligent person in disregarding [it] as so highly improbable and remote as to be lacking in reason and substance." Briggs v. Commissioner, 72 T.C. 646, 657 (1979), aff'd without published opinion, 665 F.2d 1051 (9th Cir. 1981); see 885 Inv. Co. v. Commissioner, 95 T.C. 156, 161 (1990) (defining "so remote as to be negligible" as "a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction" (quoting United States v. Dean, 224 F.2d 26, 29 (1st Cir. 1955))).

Irrespective of the use of an escrow agent, any conditions that existed at closing were so remote as to be negligible. We find that Glade Creek relinquished control upon payment of the $35,077 to the settlement agent at closing. Respondent argues that we should infer that the settlement agent was Glade Creek's agent and material conditions existed before it would pay the $35,077 to the Conservancy because petitioner did not introduce a copy of the escrow agreement into evidence. See Wichita Terminal Elevator Co. v. Commissioner,

**[\*28]** 6 T.C. 1158, 1165 (1946) (inferring that unproduced evidence is unfavorable to the party with possession over it), aff'd, 162 F.2d 513 (10th Cir. 1947). Under the circumstances of this case, we find such an inference unwarranted. Ministerial escrow tasks are generally not considered substantial limitations or restrictions on a taxpayer's receipt of funds and are not conditions precedent of the type that precludes the transfer of control. SWF Real Estate LLC v. Commissioner, T.C. Memo. 2015-63, at \*83. The chance that the settlement agent would not pay the escrowed funds to the Conservancy was so remote as to be negligible. Once the funds were deposited into escrow, they were not under Glade Creek's control. Glade Creek had directed their payment to the Conservancy and could no longer use or redirect the funds. We find that Glade Creek is entitled to deduct the $35,077 donation for 2012.

III.    Accuracy-Related Penalties

Respondent asserted a 40% penalty under section 6662(e) and (h) for a gross valuation misstatement and, alternatively, a 20% penalty under section 6662(a) and (b)(1), (2), and (3) for negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. The parties stipulated that respondent has complied with section 6751(b) for all asserted penalties. Only one accuracy-related penalty may be

**[\*29]** imposed on any given portion of an adjustment.  Sec. 1.6662-2(c), Income Tax Regs.

Taxpayers who meet the technical requirements for a charitable contribution of a conservation easement may deduct the easement's fair market value.  Sec. 1.170A-1(c)(1), Income Tax Regs.  A taxpayer makes a gross valuation misstatement when it claims a value for the donated property that is 200% or more of the correct amount.  Sec. 6662(h).  On its 2012 return Glade Creek claimed an easement deduction of $17,504,000.  If we find that the easement's fair market value is $8,752,000 or less, there is a gross valuation misstatement as the claimed deduction is more than 200% of the correct amount.  Reasonable cause is not available as a defense to the gross valuation misstatement penalty for the deduction of donated property but is a defense to the alternative penalties respondent asserts.  Sec. 6664(c)(3).

A.    Valuation of Conservation Easement

The fair market value of property is the price at which it would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  Sec. 1.170A-1(c)(2), Income Tax Regs.  When there is a substantial record of sales of comparable properties, we determine the donated property's fair market value

[*30] on the basis of the sale prices of those comparables.  Sec. 1.170A-14(h)(3)(i), Income Tax Regs.  Because sales of conservation easements are rare, the regulations authorize the use of a before and after valuation method to value easements.  Id.  Under the before and after method, the easement's fair market value is the difference between the fair market value of the property unencumbered by the easement (before value) and its fair market value after the easement's grant (after value).  Id.; see Hilborn v. Commissioner, 85 T.C. 677, 688-689 (1985).  When the donor owns additional property unencumbered by the easement, the deduction is decreased for any enhancement to the value of the unencumbered property as a result of the easement (enhancement value).  Sec. 1.170A-14(h)(3)(i), Income Tax Regs.

An appraiser may use the comparable sales method or another accepted method to estimate the before and after values.  Hilborn v. Commissioner, 85 T.C. at 689.  Comparables must be similar in nature to the donated property and sold in arm's-length transactions within a reasonable time of the donation.  Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979).  It is appropriate to adjust the sale price of a comparable to account for differences in the sale date and the size or other features of the property.  Id.

**[*31]** We rely on expert opinions to assist us with the determination of fair market value. Fed. R. Evid. 702. We evaluate expert opinions in the light of the experts' demonstrated qualifications, the factors they considered to reach their conclusions, and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986); Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by an expert opinion and may accept or reject expert testimony, in part or in its entirety, in the exercise of our sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Laureys v. Commissioner, 92 T.C. 101, 127 (1989).

### 1. Highest and Best Use

The fair market value of land is generally determined on the basis of its highest and best use. Hilborn v. Commissioner, 85 T.C. at 689-690. The highest and best use is "the highest and most profitable use for which property is adaptable and needed or likely to be needed in the reasonably near future". Olson v. United States, 292 U.S. 246, 255 (1934); see Symington v. Commissioner, 87 T.C. 892, 897 (1986). Whether the owner has put the property to such use or intends to do so is not determinative. Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986). Highest and best use is a question of fact and requires an objective

[*32] assessment of the likelihood that the donated property would be put to such use. Id. at 408; sec. 1.170A-14(h)(3)(ii), Income Tax Regs.

The parties' experts disagree over the highest and best use of the easement property unencumbered. Respondent argues that its highest and best use was rural residential, agricultural, or recreational use. He argues that the residential development petitioner advocated, similar to ILC's project, was not economically feasible on the easement date and that the property's steep topography made it unsuitable for residential development. He suggests that the soil could not support development. His argument contradicts not only ILC's project but also the numerous State and county approvals and the credible testimony of Messrs. Norton, Clark, and Vincent. Mr. Vincent testified about the work that went into obtaining approvals for ILC's plan including soil testing to determine its suitability for development. He credibly testified that tracts II and III could have been developed. While much of the land was steep, the hypothetical development had a unit density per acre of .3, meaning that much of the land would not have been used for home construction in the hypothetical plan. Mr. Broome did not evaluate the extensive development work ILC performed on the property.

Respondent also argues that the failed developments by ILC and Long Branch Lakes, one of the seven benchmarks, are proof that residential

[*33] development was not financially feasible on the easement property. Respondent argues that ILC's project was a failure, citing the two sales in 2010 and 2011 and ignoring the lots sold during 2007 and 2008 despite the recession. Mr. Broome also characterized the ILC development as a failure. He mistakenly testified that ILC sold 19 lots from 2008 to 2012 when in fact it sold 55 lots. He was unaware of ILC's early success selling 121 lots in less than two years during 2007 and 2008, the later year affected by the recession. He did not account for the negative impact of the economic recession or the distressed real estate market on ILC's project or the significant market rebound by the easement date. At trial he acknowledged that poor market conditions affected the sale of tract I lots.

Further, Mr. Broome did not consider the internal turmoil among ILC's original members and later Hawks Bluff's members that led some to abandon the project. A factor contributing to the substantial decline in sales in 2009 through 2012 was the entities' financial distress, which meant that there was no money available for marketing. Mr. Broome did not speak to anyone involved in the ILC project. He did not know that ILC had stopped marketing the tract I lots by 2010 and was unaware of the factors that contributed to the decline in sales of tract I lots that were unrelated to the land's development potential. He simply viewed

**[*34]** ILC's project as a failure and concluded it was not feasible to develop tracts II and III.

The economy had significantly recovered by the easement date, and the seven benchmarks Mr. Norton identified had some success. Mr. Vincent testified that the land had relatively flat areas both above and below the escarpment suitable for single-family homes. The easement property had plotted lots, a concept plan designed by a licensed engineer, and significant infrastructure work including upgraded utility and water capacity, completed soil testing, and approvals for septic tanks and sewage and storm water plans. ILC's decision not to record the platted lots in tracts II and III until it was ready to develop those tracts is irrelevant to their development potential. It did not record the lots to avoid a potential property tax increase. Residential development was physically and financially feasible on the easement date. In the light of the improved real estate market and the significant infrastructure work and approvals previously granted, a hypothetical buyer would have reasonably purchased the property for the development of a vacation or residential community. See Frazee v. Commissioner, 98 T.C. 554, 563 (1992). Accordingly, we hold that residential development is the unencumbered property's highest and best use.

**[\*35]**        2.        <u>Fair Market Value</u>

Mr. Broome used a comparable sales method to determine the before and after values of the unencumbered easement property.  At trial we struck his after value analysis as not helpful and reserved judgment on petitioner's objection to Mr. Broome's before valuation.  Petitioner argues that we should exclude Mr. Broome's report in its entirety or strike his before value analysis on three grounds: his failure to research whether there were sales of comparable easements, his incorrect use of market value instead of fair market value, and his failure to adequately explain to the Court the qualitative adjustments he made to the sale prices of the comparables to account for the differences in the physical features of the easement property and the comparable properties.  We find the first two alleged errors immaterial.  We find that the third ground affects the reliability of Mr. Broome's before valuation but is not a reason to exclude it.

Petitioner argues that a determination that there are no sales of comparable easements is a mandatory step in the valuation process under the regulations before an expert can employ the before and after valuation method.  <u>See</u> <u>Schmidt v. Commissioner</u>, T.C. Memo. 2014-159, at \*33 (stating that the regulations apply the before and after method "only where there is no substantial record of comparable easement sales"); sec. 1.170A-14(h)(3)(i), Income Tax Regs.

**[*36]** (requiring use of comparable sales to determine the fair market value of a donated easement where a substantial record of sales exists). While Mr. Broome did not perform this step, it has no impact on our ability to review his before valuation as Mr. Clark testified there were no sales of comparable easements.

Mr. Broome's use of market value instead of fair market value does not require exclusion of his before valuation. See sec. 1.170A-1(a), (c)(1), Income Tax Regs. (prescribing fair market value). We have stated: "In a case of unilateral noncompliance, where one party's proffered method complies with the regulation but the other's does not, it might be appropriate, or even mandatory, for a court to adopt the opinion of the expert whose method complies with the regulation." Pine Mountain Pres., LLLP v. Commissioner, T.C. Memo. 2018-214, at *28, aff'd in part, rev'd in part, vacated, and remanded, __ F.3d __, 2020 WL 6193897 (11th Cir. Oct. 22, 2020). Mr. Broome was unaware that the regulations prescribed the fair market value standard. He testified that the two standards are similar but not identical; he did not explain the differences fully. We have observed that market value adopts selective components of fair market value, but even though the two standards are not identical, we have accepted the two terms as consistent. Crimi v. Commissioner, T.C. Memo. 2013-51, at *61-*62 & n.27. We find the application

**[*37]** of the market value immaterial to our determination of whether to rely on Mr. Broome's before value.

We agree with petitioner that Mr. Broome's limited explanation of the adjustments he made to the comparable sale prices makes his before valuation unreliable. We have rejected comparable sale valuations that lacked detailed analysis of the price adjustments necessary to account for the differences between the subject property and the comparable. See Estate of Wineman v. Commissioner, T.C. Memo. 2000-193, slip op. at 29-30.

Mr. Broome described in general terms the characteristics of each comparable that made it inferior or superior to the easement property. He did not provide the quantitative adjustments causing us to be unable to evaluate whether he properly adjusted the comparable sale prices to account for the differences between the comparables and the easement property. He testified that quantitative price adjustments, or percentage adjustments, are hard to support. However, a more significant issue is Mr. Broome's choice of comparables. His comparables would not support a vacation community similar in size to the hypothetical development that we have determined to be its highest and best use. Because he rejected a vacation community as the easement property's highest and best use, Mr. Broome's valuation is of little relevance. He was not evaluating the

[*38] comparables for their development potential and chose comparables that were generally inferior for such a use because of their topography, physical features, and access.

Not only were his comparables dissimilar from the easement property, the sales occurred an average of four years before the easement date during a distressed real estate market. The closest sale was nearly three years before the easement date. He did not make a market timing adjustment to the comparable sale prices to account for the significant change in market conditions between the comparable sale dates and the easement date, an omission that makes his valuation wholly unreliable. Five of the seven sales occurred during the downturn in the real estate market and the other two sales occurred at the beginning of the recovery.

Mr. Broome also failed to take into account the sales history of lots in ILC's project. He relied on inaccurate sale information on tract I lots: 121 lots in 2007 and 2008 despite the beginning of a distressed real estate market and economic recession. This data supports the income potential of the development of tracts II and III. Mr. Broome was unaware of the issues facing ILC and Hawks Bluff unrelated to the development potential of the land including that ILC stopped marketing the lots during 2009.

[*39] Further, Mr. Broome did not consider the significant infrastructure work and approvals previously granted for ILC's project. Mr. Vincent and ILC invested vast amounts of time and money on the development of all three tracts, spending over $6 million. Most infrastructure work took place on tract I. However, ILC had successfully completed numerous steps toward the development of all three tracts. ILC constructed a pumping station and installed upgraded pipelines to service all three tracts, upgraded electrical lines that could service residential developments on all three tracts, paved access roads leading up to tracts II and III, platted lots on the basis of a design by a licensed engineer, completed soil testing, and obtained development approvals for all three tracts. Tracts II and III clearly benefited from ILC's work even though ILC had not yet extended utilities to those tracts. Mr. Broome erred by disregarding the value added to the easement property from ILC's infrastructure and approvals.

Mr. Broome's comparable sales are nothing more than a list of sales of large tracts of land in the general area of the easement property. The comparables were inferior to the easement property in terms of the development potential. Some of his comparables were unbuildable, inaccessible tracts of timber land purchased by timber companies. Mr. Broome's highest priced comparable is Old CC Rd. which sold for $2,200 per acre, a price which would result in a before value of $2.9

[*40] million.  We question its superiority to the easement property as Mr. Broome opined for a residential resort development marketed as a mountain getaway. Furthermore, the sale occurred over four years before the easement's grant and during the beginning of the recession, which Mr. Broome did not take into account.

Mr. Broome's before value, $1.5 million, severely undervalues the easement property when compared to the $9 million ILC paid for all three tracts in 2006.  He even valued it at less than its assessed value, $2.2 million, and previous sales prices for the tracts, $2.2 million in August 2004 and $4.8 million in January 2005.  He ignored the value added from ILC's infrastructure work and relied on incorrect sales information from ILC's project.  We further fault his valuation because he did not apply a timing adjustment.  Even if the recovery of the real estate market in Tennessee lagged the national recovery as respondent alleges, making no adjustment is clearly wrong.  We place no weight on Mr. Broome's before valuation.  See Chiu v. Commissioner, 84 T.C. 722, 734 (1985) (stating that we are not required to adopt the opinion of an expert that is contrary to our own judgment).

**[*41]**                     a.     <u>Before Value</u>

Mr. Clark used a discounted cashflow analysis to value the easement property.  The discounted cashflow method values property on the basis of future income projections.  There is a degree of inherent unreliability in using it to value undeveloped real property that does not have an income-producing history.  <u>See</u> <u>Whitehouse Hotel Ltd. P'ship v. Commissioner</u>, 139 T.C. 304, 324-325 (2012), <u>aff'd in part, vacated in part, and remanded</u>, 755 F.3d 236 (5th Cir. 2014); <u>Ambassador Apartments, Inc. v. Commissioner</u>, 50 T.C. 236, 243-244 (1968), <u>aff'd</u>, 406 F.2d 288 (2d Cir. 1969).  We are presented with limited options to determine the before value as there are no comparable sales of the easement property and the sales identified were not close to the easement date.  Respondent did not present any evidence of the easement property's value to a developer but raises valid concerns with Mr. Clark's assumptions.

Mr. Norton prepared a market study of the demand for a resort-style development on the easement property and determined price ranges for lots in a hypothetical development on the easement property similar to ILC's project, which Mr. Clark used to compute the hypothetical development's gross revenues in his discounted cashflow analysis.  Differing from ILC's project, Mr. Norton recommended the construction of model and for-sale homes and upfront capital

[*42] investments in amenities and aggressive marketing. He determined the price ranges for the lots in the hypothetical development on the basis of seven benchmarks and provided the price range, average lot price, range of lot sizes, and average lot size for each lot type in each benchmark. However, he used absolute prices for the lots in the benchmarks, did not adjust the prices for lot sizes, and did not provide per-acre prices.

Petitioner places significant weight on Jasper Highlands in its valuation argument. Mr. Norton referred to Jasper Highlands as an excellent example of the development potential of the easement property. Jasper Highlands was a 5,500-acre development with 700 lots, 21.3 miles of bluff views, and 3,000 acres of conserved land. It implemented a development strategy similar to Mr. Norton's recommendation of upfront investment in amenities "to show confidence to the prospective buyer in a period where real estate purchasing prospects are more educated and wearier about real estate investment after the real estate crisis". Mr. Broome acknowledged Jasper Highlands was a success. It sold over 230 lots from 2012 to 2015. Its sales increased substantially in 2016 and 2017 selling 270 and 200 lots, respectively, after completion of a road that provided better access to the lots. Interior lot prices averaged $77,000, and view lots averaged $151,884.

[*43] Jasper Highlands had significant advantages over the easement property, including its proximity to Chattanooga, 30 miles, easier access from interstate highways, significantly more land with bluff views, 21.3 miles versus 4 miles, and greater commercial development, resulting in greater appeal to potential vacation home buyers. Also, Mr. Norton was not aware of a State prison located 10 miles from the easement property and at trial dismissed it as irrelevant.

Other benchmarks are also closer to major cities, have better accessibility from interstate highways, and superior or distinctive features that give them an advantage over the easement property. Fairfield Glade is a self-contained, 12,500-acre community built in the 1970s and 1980s with its own commercial development. In 2004 it added 212 acres with 196 new lots. The maturity of the community enhanced the new lots' marketability, and they sold for considerably more than the lots in other benchmarks, averaging $86,000 for interior lots and $135,000 for view lots, adjusted for size approximately $180,000 to $200,000 per acre. Brow Wood is a retirement and assisted living community on 22 acres with 54 lots. The average prices for interior and view lots were $96,333 and $178,900, respectively, and the averages per acre were $442,000 and $513,000, respectively. Each of these three benchmarks had substantial advantages over and distinct features from the hypothetical development on the easement property. By relying

**[\*44]** on them in his price recommendation Mr. Norton overestimated the prices of the hypothetical development's lots. In comparison Hawks Bluff Van Buren sold all of its 200 lots before the recession and averaged $38,526 and $89,712 for interior and view lots, respectively.[11]

Respondent argues that we should place the most weight on ILC and Long Branch Lakes, the two benchmarks on the Cumberland Plateau in Bledsoe County. He argues that both developments failed, indicating Bledsoe County could not support the type of development Mr. Norton and Mr. Clark envision. He cites numerous facts relating to Bledsoe County to argue it could not support the hypothetical development, including that 23% of the population lives below the poverty line, 35% had subprime credit, and the county had a 10.5% unemployment rate. These statistics may have some effect on the valuation, but we recognize that petitioner's experts envision a vacation home community marketed to out-of-State purchasers. Both ILC and Long Branch Lakes were marketed to out-of-State purchasers.

Long Branch Lakes is a 4,500-acre, 400-lot development approximately 10 miles north of the easement property. It included lakefront lots and an equestrian

---

[11]Hawks Bluff Van Buren is in Van Buren County, Tennessee, and is unrelated to ILC's project or the Bledsoe property.

**[*45]** village marketed to horse owners with lots several acres in size. It made upfront investments in amenities including a general store, swimming pools, two large lakes, tennis courts, and sports fields. It enjoyed some initial success. It started selling lots in 2007, selling 35. Sales increased during the recession, 42 and 53 lots in 2008 and 2009, respectively, before decreasing in 2010 to 35 lots. In 2011 Long Branch Lakes experienced a significant drop in sales, selling only five lots, which petitioner attributes to decreased marketing and the developer's decision to focus on other projects. Long Branch Lakes sold 51 lots from 2012 to 2016, an average of 10 per year, and approximately 200 remaining lots were sold in bulk in 2017 as part of the developer's bankruptcy.

Likewise, ILC had some initial success despite the looming recession. It sold 121 lots during 2007 and 2008. Many factors contributed to ILC's low sales thereafter including the lack of funds to market the lots, the substantial debt incurred for infrastructure costs, and the internal turmoil with members abandoning their interests and walking away from their debt obligations. While we do not agree that ILC and Long Branch Lakes show the hypothetical development was not feasible, they do indicate a degree of uncertainty and risk to a hypothetical development that Mr. Clark did not properly account for in his

[*46] discounted cashflow analysis.  Moreover, the sale prices for these lots indicate that Mr. Clark overestimated the lot prices in a hypothetical development:

| Lot type | Low | High | Average |
|----------|-----|------|---------|
| ILC | | | |
| Interior | $31,410 | $98,813 | $46,186 |
| View | 79,000 | 120,900 | 100,254 |
| Long Branch | | | |
| Interior | 50,000 | 100,000 | 74,300 |
| View | 142,000 | 200,000 | 171,250 |

Mr. Clark priced interior lots in two categories, interior and nature view, at $50,000 and $62,500, respectively, prices that are above the average for ILC's sales.  While these prices are below the prices for Long Branch Lakes, its interior lots were significantly larger averaging over three acres, and the average per-acre price was approximately $24,000.

We find that Mr. Clark's sale prices are not reasonably supported by the market data.  He priced 187 interior lots at $50,000 and an additional 88 interior lots with nature views at $62,500, generating gross revenues of $14.85 million.  He used Mr. Norton's average price for each lot type, but Mr. Norton's price range for interior lots started at $30,000.  Also, Mr. Clark supports his $50,000 price for interior lots with sales data from Jasper Highlands, which could support higher

[*47] prices than the easement property because of its proximity to Chattanooga and its greater commercial development among other superior features. Also, Mr. Clark's $100,000 price for lakefront and bluff view lots was likely too high. ILC's average price for bluff and premium bluff view lots was $100,254. ILC had no lake view lots. We find the following prices more reasonable on the basis of the benchmarks, expert testimony, and market data: interior, $40,000; nature view, $50,000; lakefront and bluff view, $80,000; and premium bluff view, $125,000. On the basis of these sale prices, without any adjustment to the absorption rate, we determine gross revenues from a hypothetical development of approximately $25.1 million and $27.6 million when adjusted for annual appreciation of the unsold lots.[12] See infra note 15.

Respondent challenges Mr. Clark's due diligence into the land's capacity to support a residential development and his estimate of construction and operating costs. He argues that Mr. Clark's report lacked detailed development costs and Mr. Clark did not conduct a soil analysis to determine the feasibility of the development. Mr. Clark consulted with local developers and construction companies. He specified construction costs per linear foot for utilities and roads

[12]We find that Mr. Clark's estimated annual lot sales over the seven-year absorption rate are supported by the market data including ILC's sales history. ILC sold 75 lots its first year.

**[*48]** including the cost to grade, base, and chip and seal the roads. He estimated overhead expenses on the basis of 1.5% of gross sales, which we find sufficient for maintenance and holding costs. We find Mr. Clark's cost estimates reliable and supported by his due diligence. However, he failed to adjust costs for inflation, which we find in error. Our estimate includes some cost inflation. In total he estimated $6.8 million in construction and operating costs. We estimate that costs would be lower in each year of the absorption period for two reasons: (1) we eliminated the line-item expense for profit and accounted for profit by increasing the discount rate, discussed below and (2) we calculated some costs (overhead, sales commission, and closing costs) on the basis of a percentage of gross revenues so costs decreased to reflect our reduction in projected gross revenues. In total we estimated costs of $5.8 million and net revenues of $21.8 million. See infra note 15.

One aspect of Mr. Clark's cost analysis that we find in error is his failure to account for the construction costs for model and for-sale homes. The homes are a feature of Mr. Norton's hypothetical plan. Mr. Clark agreed with this plan feature. Both experts testified about the need for upfront capital investments in amenities, model homes, for-sale homes, and aggressive marketing. Petitioner argues the homebuilding costs are irrelevant for purposes of valuing the land. While that

**[\*49]** may be true, in our opinion such costs are a factor that a hypothetical developer would consider. The need to construct homes adds risk and requires additional capital investment or financing. It is inappropriate to ignore these costs. We account for the risk added by these costs through the discount rate, further indicating that Mr. Clark did not adequately account for profit or risk with a line-item expense of 15% of expenses.

Mr. Clark testified that a 15% profit margin was indicative of the risk inherent to the developer over the absorption period. He characterized the 11.25% discount and the 15% profit margin as a combined discount of 26.25%. However, he did not apply the profit margin in the same manner as the 11.25% discount rate. It is not a combined discount in his computation. Instead, he calculated "profit on expenses" equal to 15% of the construction and operating costs each year, resulting in a profit to the hypothetical developer of $891,025 for the entire project. He deducted the developer's profit as a line-item expense from gross revenues and then applied an 11.25% discount rate to net revenues.[13] The 11.25%

---

[13]Mr. Clark applied a present value factor (PVF) to calculate the present value of each dollar received or expended over the absorption period and used a midyear convention, $PVF = 1 / (1 + r)^{n-1/2}$ where r is the discount rate and n is the year of the absorption period. See Schmidt v. Commissioner, T.C. Memo. 2014-159, at \*52-\*53 (finding a midyear convention a more reasonable assumption as sales and expenses would occur throughout the year).

[*50] discount resulted in an $8.5 million reduction in net revenues. We disagree with this method to account for the developer's profit and eliminated the profit on expenses from our cost estimate. A line-item expense for profit does not adequately compensate a hypothetical developer for the risk inherent in the project. Mr. Clark testified that the profit on expenses is one source of the developer's profit, but we are not convinced that an 11.25% discount rate plus a line-item expense of less than $1 million is sufficient to induce a developer to assume the risks involved with a residential development.

Mr. Clark determined the 11.25% discount rate on an assumption that a hypothetical developer would finance the project with a debt-to-equity ratio of 60/40. He testified that the developer could borrow at 6% (60% debt at 6% interest equals a rate of .036) and would receive an 18% return on his equity investment (40% equity at an 18% return equals a rate of .072), resulting in a combined rate of 10.8%, which he rounded to 11%. He then considered alternate investment opportunities available to a hypothetical developer, including the reserve bank discount rate, prime rate, Federal funds rate, 3-month certificate of deposit rate, 6-month Treasury bill rate, 10-year U.S. bond rate, and speculative-grade bond rate. On the basis of these rates he estimated a 2% current rate, a 5% return on speculative investments, and a 5% nonliquidity rate, resulting in a sum

**[*51]** of 12%. On the basis of these two rates (11% and 12%), he determined a discount rate of 11.25%. We find the 18% return on equity insufficient to account for the risk to a hypothetical developer. The 11.25% rate is too low even with the additional line-item expense for profit. Mr. Clark did not adequately account for a developer's risk and underestimated the return on equity that would be necessary to compensate for a developer's risk in the light of the distance from major urban areas, limited commercial development nearby, and competition from benchmarks.

Mr. Clark referred to the 11.25% discount rate and the 15% line-item expense for profit as a combined discount. We disagree with his label. He compared this purported 26.25% combined discount rate with data from a regional survey of actual discount rates for real estate development in the Southeastern United States and pro forma rates. Actual discount rates ranged from 17% to 40% for planned developments with 100 to 500 units with slightly higher pro forma rates.[14] The average actual rate for such a development was 27.34%, and the average pro forma rate was 26.25%. According to Mr. Clark's report, for planned developments such as the hypothetical development, profit risk is included in the discount rate but for condominiums and cooperatives it is a line-item expense.

---

[14]RealtyRates.com conducted the survey for the fourth quarter of 2012. The survey included responses from appraisers, lenders, and local, regional, and national developers.

[*52] Mr. Clark deviated from industry practice by including profit as a line-item expense and did not explain to our satisfaction why he did so. Applying a discount rate of 26.25% to our computation of net revenues, the discounted cashflow analysis would support a before value of approximately $9.3 million.[15]

ILC purchased the three tracts in 2006 for over $9 million after an extensive investigation of the land's development potential. It paid approximately $7 million for tracts II and III. The sale occurred between a willing buyer and a willing seller in an arm's-length transaction. The purchase price represents the land's fair market value in 2006. In April 2011 the seller agreed to reduce the

---

[15]We compute the discounted value using a PVF computed as $1 / (1 + 0.2625)^{n-1/2}$.

| Year | Gross revenue | Costs | Net revenue | PVF | Discounted value |
|------|-----------|-------|-------------|-----|------------------|
| 1 | $1,300,000 | $1,046,106 | $253,894 | .88999 | $225,963 |
| 2 | 3,473,675 | 879,567 | 2,594,108 | .70494 | 1,828,690 |
| 3 | 4,751,450 | 972,661 | 3,778,789 | .55837 | 2,109,962 |
| 4 | 5,479,975 | 918,727 | 4,561,248 | .44227 | 2,017,303 |
| 5 | 5,630,800 | 928,415 | 4,702,385 | .35032 | 1,647,340 |
| 6 | 4,840,100 | 865,136 | 3,974,964 | .27748 | 1,102,973 |
| 7 | 2,097,375 | 177,548 | 1,919,827 | .21978 | 421,940 |
| Total | 27,573,375 | 5,788,160 | 21,785,215 | --- | 9,354,171 |

[*53] unpaid purchase price by $1.3 million acknowledging the effects of the downturn in the economy. While we consider this fact, we balance it against the fact that Hawks Bluff was unable to pay its debt and was facing default. It is likely that the seller considered these facts when it made its decision to reduce the debt.

We also consider ILC's $6 million investment in infrastructure and its work to obtain approvals which benefited all three tracts, including ensuring a water supply, upgrading water and electrical capacity, soil testing, Government approvals, and access roads leading to the easement property. Mr. Vincent credibly testified that ILC performed soil testing on tracts II and III. ILC's infrastructure and approval work clearly increased the fair market value of the easement property. Mr. Clark estimated that development on tracts II and III would require an additional $2.6 million for infrastructure costs. We find it reasonable that the unencumbered easement property would have increased by $2 and $2.5 million on the basis of appreciation and ILC's infrastructure work. On the basis of the record we find that the easement property had a before value of $9,353,171. See supra note 15.

Respondent argues for the first time on brief that we should determine the before value by reference to the $3,224,000 subscription price for 91% of

[*54] Sequatchie, resulting in a before value of no more than $3,539,561. We reject this argument as Mr. Vincent credibly testified that his objective in the subscription was to receive enough money to repay the Hawks Bluff debt. The subscription price was set for this purpose. It was not intended to reflect the easement property's fair market value, and it has no bearing on the easement property's fair market value. Mr. Vincent credibly testified that he wanted to protect the original vision of ILC's plan and to preserve the natural beauty of the easement property. He had a financial interest in protecting the easement property from timber harvesting or low-scale development because he retained ownership of the unsold lots in tract I through Hawks Bluff and hoped to sell them. Understandably, he had no desire to develop the tracts himself. We do not question Mr. Vincent's desire to preserve the property through a conservation easement.

### b. After Value

At trial, we excluded the portion of Mr. Broome's report containing the after value analysis. On brief respondent argues that the after value is $476,400, the easement property's assessed value for 2013, or $213,629, the value Glade Creek reported on its 2012 return. We accept respondent's argument as a concession and

[*55] find an after value of $476,400.  The easement's fair market value is $8,876,771.  Accordingly, we do not sustain a penalty for gross valuation misstatement.

### B.    Substantial Valuation Misstatement

A taxpayer makes a substantial valuation misstatement if the claimed value is more than 150% but less than 200% of the correct amount, $8,752,001 to $11,669,333 in this case.  See sec. 6662(b)(3).  Glade Creek made a substantial valuation misstatement, and the 20% penalty will be imposed unless petitioner establishes that Glade Creek acted with reasonable cause and in good faith in its valuation of the easement.  See sec. 6664(c)(3).  We determine reasonable cause and good faith on a case-by-case basis taking into account all pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Generally, the most important factor is the taxpayer's efforts in assessing its proper tax liability.  Id. Petitioner has the burden of proving reasonable cause.  See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

In the context of a valuation penalty, taxpayers can establish reasonable cause on the basis of their reasonable reliance on a qualified appraisal by a qualified appraiser and their own good faith with respect to the valuation.  Sec. 1.6664-4(h), Income Tax Regs.; see Dunlap v. Commissioner, T.C. Memo.

[*56] 2012-126; <u>1982 East, LLC v. Commissioner</u>, T.C. Memo. 2011-84; <u>Evans v. Commissioner</u>, T.C. Memo. 2010-207.  A taxpayer may also rely on professional advice as a defense if:  (1) the taxpayer reasonably believed that the professional is competent and has sufficient expertise, (2) the adviser has all necessary and accurate information, and (3) the taxpayer actually relied on the advice in good faith.  <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 98-99 (2000), <u>aff'd</u>, 299 F.3d 221 (3rd Cir. 2002).  In general, reliance on a promoter is not reasonable or in good faith and is not a defense to an accuracy-related penalty. <u>Mortensen v. Commissioner</u>, 440 F.3d 375, 387 (6th Cir. 2006), <u>aff'g</u> T.C. Memo. 2004-279; <u>Paschall v. Commissioner</u>, 137 T.C. 8, 22 (2011); <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. at 98.

With respect to adjustments to amounts reported by an LLC, reasonable cause is determined by examining the actions of the managing member.  <u>Stobie Creek Invs. LLC v. United States</u>, 608 F.3d 1366, 1380-1381 (Fed. Cir. 2010).  As Glade Creek's manager, Mr. Campbell's actions are those relevant for purposes of the reasonable cause defense.  Petitioner argues that Mr. Campbell relied on the advice of two appraisers, Mr. Clark and Mr. Clover, to value the easement.  We find that the appraisers determined the before value to achieve the tax savings goals of the easement transaction and did not attempt to accurately ascertain the

[*57] easement's fair market value.[16]  Glade Creek did not make a good faith investigation of the easement's fair market value and the reasonable cause defense is not available.

Mr. Campbell knew that the easement was substantially overvalued.  In fact, overvaluing the easement was a part of the easement transaction he devised.  Neither Mr. Campbell nor the appraisers he selected actually sought to determine the easement's fair market value.  Rather, Mr. Campbell wanted an appraisal that accomplished his tax objectives for the easement transaction.  The appraised value was determined on the basis of the need to attract investors by providing a sufficient tax benefit to raise enough money to repay the Hawks Bluff debt and to pay the fees of the professionals involved.  It was not a good faith valuation of the easement property.  Further, Mr. Campbell's decision to engage two appraisers does not establish a good faith investigation.  Mr. Campbell did not make a good faith investigation into the easement's fair market value or rely on the appraisers in good faith to ascertain the easement's fair market value.

---

[16]The parties also disagree over whether Mr. Clark's appraisal was a qualified appraisal and whether he was a qualified appraiser.  See sec. 6664(c)(4)(B) and (C).  As we find the appraisal was not in good faith and Glade Creek is not entitled to a reasonable cause defense, we do not address these alternative issues.

[*58] Respondent argues that Mr. Campbell is a promoter. Through Evrgreen, he manages 30 passthrough entities involved in easement transactions similar to the one here where he markets investments in the entities as tax saving strategies. Sequatchie's promotion materials emphasized the tax benefits of an investment, provided examples of the tax breaks from different investment amounts, and warned investors of the potential tax risks from investing. Mr. Vincent approached Mr. Campbell for a tax strategy. Sequatchie's sole business purpose was to acquire majority control over Glade Creek and then vote its interest to cause Glade Creek to donate the easement for its tax benefits. Its investors voted to grant the easement shortly after acquiring their interests.

Petitioner argues that Mr. Campbell reasonably and in good faith relied on Mr. Pollock to provide tax advice and the Conservancy to draft the deed to meet the legal requirements of a charitable contribution deduction for a conservation easement. Irrespective of whether we agree with this argument, Mr. Campbell's tax scheme primarily relies on the overvaluation of the easement, and he knew the easement was overvalued. Accordingly, we sustain the 20% penalty for a substantial valuation misstatement for the portion of the underpayment attributable

**[*59]** to the portion of the claimed value in excess of the easement's fair market value.[17]

### C. Negligence or Disregard or Substantial Understatement Penalty

Respondent asserts the 20% penalty with respect to Glade Creek's underpayment attributable to a misstatement of value. He does not assert the 20% underpayment penalty for negligence or disregard of rules and regulations or a substantial understatement of income tax. He states that the issue with respect to the 20% penalty is whether it "applies to Glade's misstatement of value * * * for negligence, a substantial understatement of income tax, or a substantial valuation misstatement" and that "[s]hould the Court decide that the gross * * * or the substantial valuation misstatement penalty * * * does not apply to any underpayment of tax attributable to the adjustments * * *, then the accuracy-related penalty under section 6662(a) applies to any underpayment of tax" for negligence or disregard of rules or regulations or a substantial understatement of

---

[17]As an alternative argument, respondent had argued that if we were to allow the easement deduction, it is limited to Glade Creek's basis in the easement property on the basis that the easement property had been inventory in the hands of Hawks Bluff. Respondent does not assert this argument as a basis to impose a 20% penalty.

[*60] income tax.[18]  On brief, respondent's discussion of the 20% penalty is unclear at times as to the basis for that.  He argues that Glade Creek did not act with reasonable cause or in good faith because it improperly relied on the Conservancy to draft the deed and on Mr. Clark's appraisal, it did not obtain legal advice regarding whether the conservation easement met the requirements of section 170, and Mr. Campbell is a promoter.  However, he does not state that he seeks to apply the 20% penalty to the portion of the underpayment attributable to the adjustment below the easement's fair market value.  On the basis of our understanding of the issues as respondent presented at trial and on brief, we find that he has conceded the 20% penalty on the portion of the underpayment attributable to the amount of the deduction below the easement's fair market.[19]  We do not impose a 20% penalty for negligence or disregard of rules or regulations or provisionally impose a 20% penalty for a substantial understatement

---

[18]Respondent asserts that we should provisionally apply the 20% penalty for a substantial understatement of income tax subject to the subsequent determination of each member's resulting income tax deficiency and any defenses the member may raise.  See United States v. Woods, 571 U.S. 31, 39 (2013).

[19]In the FPAA respondent asserted that Glade Creek had not established that the easement had any value.

**[\*61]** of income tax on the portion of the easement deduction below the easement's fair market value.[20]

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

---

[20]On the basis of respondent's concession we do not address whether the involvement of a promoter in the transaction requires us to sustain the penalty on the portion of the deduction below the easement's fair market value. Moreover, we have determined that Glade Creek is not entitled to the reasonable cause defense for the portion of the deduction in excess of the easement's fair market value irrespective of whether Mr. Campbell is a promoter.